# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

PENNY KOONCE,                )
                             )
          Plaintiff,         )
                             )
     v.                      )        No. 18-cv-3095
                             )
ANDREW SAUL, Commissioner    )
of Social Security,[1]       )
                             )
          Defendant.         )

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Penny Koonce appeals from the denial of her application for

Social Security Disability Insurance Benefits (DIB) under Title II and

Supplemental Security Income (SSI) under Title XVI of the Social Security

Act (collectively Disability Benefits).  42 U.S.C. §§ 416(i), 423, 1381a and

1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and

1383(c).  Koonce filed a Motion for Summary Reversal (d/e 19).  The

Defendant Commissioner filed a Motion for Summary Affirmance (d/e 24).

The parties have consented to proceed before this Court.  Consent to the

Exercise of Jurisdiction by a United States Magistrate Judge and

---

[1] The Court takes judicial notice that Andrew Saul is now Commissioner of Social Security.  As a result, Commissioner Saul is automatically substituted in as the appropriate party.  Fed. R. Civ. P. 25(d).

Reference Order entered May 14, 2018 (d/e 8).  For the reasons set forth below, the Decision of the Commissioner is AFFIRMED.

STATEMENT OF FACTS

Koonce was born on March 7, 1973.  She completed the 10th grade. She previously worked at a Subway restaurant, two gas stations, and a retail store.  She worked as a cashier, sandwich maker, and baker at these places.  She has not worked at any substantial gainful activity since January 18, 2013.[2]  She suffers from obesity, diabetes, degenerative disc disease, degenerative joint disease, sleep apnea, migraine headaches, fibromyalgia, depression, bipolar disorder, and anxiety disorder.  R. 18, 24, 31, 350, 363.

On November 27, 2013, Koonce saw Nurse Practitioner Sandra Brummet, FNP-BC, in the office of Dr. Manjeshwar B. Prabhu, M.D.  R. 545-46.  Koonce said that she hurt her left knee getting out of her van.  She said her knee had been hurting for a while.  She said that it gave way and she often had to catch herself to keep from falling.  She reported that she had a knee injury when she was in high school.  She wore a splint and said that it helped.  She tried ice and ibuprofen but that did not help much.  On

---

[2] Koonce filed prior applications for Disability Benefits on July 24, 2008, and May 23, 2011.  The adjudications of the prior applications determined that she was not disabled through January 17, 2013. R. 119-39, 144-69, 350.

examination, Koonce weighed 217 pounds with a body-mass-index of 39.93.  Koonce had some crepitus with extension of the left knee.  She was "not overly tender with palpation."  Brummet saw no sign of injury to the knee.  R. 545.  Brummet prescribed meloxicam for pain and recommended an MRI and physical therapy.  Brummet said she could not afford an MRI and, in the past, physical therapy did not work and made things worse.  R. 546.

On March 31, 2014, Koonce saw Nurse Practitioner Brummet.  R. 541.  Koonce reported that she woke up about 4:00 a.m. with a migraine headache.  She was somewhat nauseous.  She said that she got one migraine a month.  She normally got through a migraine with some ibuprofen.  She said she also had been taking Depakote and propranolol.  Koonce requested a Toradol injection and Brummet gave her the shot.  Brummet told Koonce to go home and rest.  R. 542.

On June 2, 2014, Koonce saw Dr. Prabhu at an office visit for a medication check.  Koonce reported problems sleeping. On examination, Koonce had normal strength, gait, and stance.  She had intact sensation.  Dr. Prabhu renewed her medications.  He recommended avoiding caffeine and recommended an insomnia class.  R. 538-39.

On June 9, 2014, Koonce went to the emergency room at Taylorville Memorial Hospital (Taylorville Memorial) in Taylorville, Illinois. R. 433. She saw Dr. Anna McCormick, M.D. She complained of a headache that had lasted three days. She reported that she had her last migraine headache over a month earlier. Her migraine medication of Diproxen and Propranolol did not help. She said that lights and sound bothered her. She also said she was nauseous. She rated her pain at an 8 out of 10. R. 433. Her neurological examination was normal. Her strength was 5/5. Dr. McCormick administered Toradol, Reglan, and Benadryl intravenously followed by morphine and Zofran. Dr. McCormick discharged her with a prescription of Zofran and Imitrex. Koonce had a normal gait at discharge. Dr. R. 434.

On June 19, 2014, Koonce saw Dr. Prabhu for a follow up after insomnia class. She reported getting up at night to go to the bathroom and get a drink, but she said she fell back asleep. She reported some daytime sleepiness. Dr. Prabhu said her bipolar medication Seroquel could cause the daytime sleepiness. On examination, she had normal, strength, gait, and stance. Dr. Prabhu advised her on improving her sleep habits. R. 536.

On August 1, 2014, Koonce saw Dr. Mark Stern, M.D. Koonce reported lower back pain with pain into the right buttock and into both legs

for the last four months.  She reported that she had difficulty with balance and that her legs gave out on her.  She said she fell four or five times.  If she stood for 10 minutes, she started having pain in her legs.  She had pain sweeping and mopping.  Dr. Stern said x-rays showed narrowing of the L5 neural foramina.  He said an MRI had already been done that showed degenerative disc disease.  Dr. Stern suggested surgery or epidural steroid injections.  On examination, Koonce could walk on both her heels and her toes.  Straight leg test was negative.  Her reflexes were 0/4 in knees and ankles.  Dr. Stern recommended that her primary care physician Dr. Prabhu refer Koonce for epidural steroid injections and a surgical consultation.  R. 527-28.

On August 6, 2014, Koonce went to the emergency room at Taylorville Memorial complaining of stress.  She saw Dr. Paul R. Pfeiffer, D.O.  She denied any suicidal or homicidal ideations and reported that she had chronic bipolar depression.  She did not have a headache, but said she had migraines on and off for the last couple of days.  She refused to see a counselor and indicated she would talk to Dr. Prabhu later.  She asked for something to sleep and go home.  The doctor gave her Benadryl intravenously and discharged her.  R. 482-83.

On the same day, August 6, 2014, Koonce also saw Dr. Prabhu for chronic low back pain and frequent falls.  R. 525-26.  Koonce said her left knee was giving way.  R. 525.  On examination, Koonce had no swelling in her legs and her motor strength, gait, and strength were normal.  The range of motion of her knees and her back were preserved.  She had crepitus in her left knee, but no fluid.  Dr. Prabhu stated that Dr. Stern gave Koonce a cane for ambulation, but she was not using it.  Dr. Prabhu cited non-use of the cane as one reason she may be falling.  Dr. Prabhu ordered x-rays and scheduled an EMG/nerve conduction study of her back.  R. 525-26.

On August 19, 2014, neurologist Dr. Claude Fortin, M.D., performed an EMG/nerve conduction study.  The study showed mild left L5 radiculopathy.  R. 524.

On August 29, 2014, Koonce saw Physician's Assistant Nicole Venvertloh, PA-C in the offices of orthopedic surgeon Dr. Diane Hillard-Sembell, M.D.  R. 521-23.  Koonce saw Venvertloh for left knee pain. Koonce said she had the pain for the preceding month and periodically since she was a child.  She said she tried physical therapy, but that made it worse.  She tried the heat and medication Dr. Stern prescribed, but they did not work.  She said the knee gave way.  She denied numbness or tingling down her legs.  She said the knee popped and caught on her.  On

examination, the left knee was tender to palpation. The patella demonstrated crepitus and lateral tracking. Range of motion was normal with pain with extension. Stress testing was stable. Sensation was intact. No foot drop was present. Pulses were 2+. Koonce had a positive patellar apprehension. X-rays and MRI showed a laterally tracking patella. Venvertloh administered an injection into the knee. Venvertloh prescribed physical therapy to strengthen and stretch Koonce's leg muscles. R. 522.

On September 15, 2014, Koonce went to the emergency room at Taylorville Memorial. R. 586-87. She said she had elevated blood sugars in the 300s. She reported diarrhea and fatigue. She denied any vomiting or fevers. R. 586. Her examination was unremarkable except for blood sugar level of 228. Dr. McCormick gave Koonce insulin and discharged her. She was feeling better. R. 587.

On September 19, 2014, Koonce saw a physical therapist for an initial evaluation for left knee pain and acute low back pain. Koonce reported that she hurt her knee at age 13. She said she fell six times in the past twelve months. She told the therapist that her knee was "growing in" probably because a disc in her lower back was gone, and her hip was growing into her vertebra. Koonce reported that an MRI and x-ray were both negative. R. 579, 582. On examination, she had an antalgic gait, but

she did not use her cane when she walked. Koonce had limited range of motion in her trunk. She had poor strength in her abdominal muscles. Her left hip strength was 4-/5, her left knee strength was 4/5 and her left ankle strength was 4+/5. R. 579-81.

The physical therapist scheduled a course of four weeks of outpatient physical therapy. R. 583. Koonce did not return for any of the scheduled physical therapy appointments. After three consecutive absences without any calls to cancel or reschedule, the planned physical therapy sessions were discontinued. R. 584-85.

On September 25, 2014, Koonce saw Nurse Practitioner Brummet. Koonce reported a migraine headache that started the day before. Koonce said her insurance would not pay for Imitrex. Koonce also had Depakote. Koonce asked about changing medications. R. 624. Brummet gave Koonce a Toradol injection and prescribed Imitrex to see if the insurance would now cover the medication. R. 626.

On September 30, 2014, Koonce saw Physician's Assistant Venvertloh for a follow up. R. 623-24. Koonce said the injection she received at the last visit on August 29, 2014, helped with the pain slightly. Koonce said the shot lowered the pain from 10/10 to 7/10. Koonce denied any numbness or tingling; popping, catching, or locking; giving out or giving

way.  On examination, Koonce's left knee was not inflamed, but was tender to palpation.  Her patella demonstrated crepitus with a positive patellar apprehension test.   Stress testing was stable.  Other tests were normal.  Venvertloh recommended viscosupplementation.  R. 624.

On October 4, 2014, Koonce saw state agency psychologist Dr. Delores Trello, Psy.D., for a mental status examination.  R. 557-61.  Dr. Trello found that Koonce had bipolar disorder and was depressed.  Dr. Trello also found that she had anxiety disorder and a history of drug and alcohol abuse.  Koonce stopped all illegal drug use in 1998.  Dr. Trello found that Koonce did well on her mental status examination.  R. 561.

On October 28, 2014, Koonce saw Physician's Assistant Venvertloh, for her third Hyalgan injection into her knee.[3]  Koonce reported some mild improvement from the injections.  Koonce had no post-injection inflammation.  R. 617-18.

On October 29, 2014, Koonce saw state agency physician Dr. Vittal Chapa, M.D., for a consultative examination.  Koonce said that she had back pain.  She said she had narrowing of the spine.  She reported having no cartilage in her left knee.  She said that she used a cane because her

---

[3] Hyalgan is brand name of hyaluronan, a visco supplementation medication injected into affected joints. See Dorland's Illustrated Medical Dictionary (32d ed. 2012), at 875.

left knee gave out on her. Koonce stated she was told not to walk without a cane. She said she had headaches two to three times a month and they lasted for three days. On examination, Dr. Chapa asked her to walk without a cane. She limped and complained of left knee pain. Dr. Chapa stated that it appears that she needs a cane for ambulation. Koonce's knee and ankle reflexes were absent. Her triceps, biceps, and brachial radialis reflexes were 1+. Koonce had no joint redness or heat. She had crepitation on palpation of the left knee joint. The joint appeared to be stable. Koonce's hand grip was 5/5 bilaterally and she could perform fine and gross manipulation with both hands. Her lumbosacral range of motion was limited. Koonce had full range of motion in all other joints including her knees. Dr. Chapa said that subjectively Koonce said she could not feel pinprick sensation in her extremities and also her chest. Dr. Chapa assessed internal derangement of the left knee. R. 562-64.

On October 8, 2014, state agency psychologist Dr. Ronald Havens, Ph.D., completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment. R. 177-78, 181-83. Dr. Havens opined that Koonce had affective disorders and anxiety disorders. He opined that these disorders resulted in mild restrictions on daily living and moderate difficulties in maintaining social functioning and concentration, persistence

or pace.  Dr. Havens opined that Koonce did not have any episodes of decompensation of extended duration.  R. 177.  Dr. Havens opined:

> Claimant is fully oriented, free of thought disorder, free of cognitive deficits, able to competently complete [activities of daily living]. Claimant would have no difficulty understanding and remembering well enough to engage in detailed assignments but can only persist adequately enough to perform repetitive, routine tasks. Claimant has adequate, though limited, social skills but reports being anxious around groups of people and should not be expected to deal with the general public. Claimant can adjust to minor routine changes in a routine work environment.

R. 183.

On November 6, 2014, state agency physician Dr. Towfig Arjmand, M.D., prepared a Physical Residual Functional Assessment of Koonce.  R. 179-81, 192-94.  Dr. Arjmand opined that Koonce could occasionally lift 10 pounds and frequently lift 10 pounds; stand and/or walk two hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally stoop, crouch, and crawl; and never climb ladders, ropes, and scaffolds; and she should avoid concentrated exposure to hazards such as machinery or heights.  R. 180-81.

On November 10, 2014, Koonce saw orthopedic surgeon Dr. Stephen Pineda, M.D., for an evaluation due to low back pain.  R. 613-17.  Koonce said she had back pain that went into her legs.  She had to use a cane to walk.  She said the pain was so bad she could barely move her leg.  She

said she received injections from Dr. Stern, but they did not help.  Dr. Pineda said that her x-rays showed mild degenerative changes at L5-S1. He noted, "There is a question of a L5 radiculopathy identified by Dr. Fortin on EMG."  R. 615.  On examination, Koonce could stand and walk.  She fired her hip, knee, and ankle flexion.  She had intact light touch sensation. Movement of her left leg generated pain.  She had 4/5 strength.  Dr. Pineda ordered an MRI.  R. 616.

On November 19, 2014, Koonce had an MRI of her lumbar spine.  It showed a mild disc bulge and hypertrophic facet progression at L4-5, now with mild canal stenosis.  R. 577.

On November 24, 2014, Koonce saw Dr. Pineda for follow up on an MRI of her lumbar spine.  R. 609-11.  Dr. Pineda said that the MRI did not show any major canal or foraminal stenosis. He said that good disc height was present.  Dr. Pineda said that the MRI was "nearly normal."  Dr. Pineda said that her pain was not due to spinal etiology.  He did not know the source of her pain.  He recommended seeing Dr. Fortin for pain management.  R. 612.

On January 21, 2015, Koonce saw Dr. Fortin for back and leg pain. Koonce reported that she had back and leg pain since 2003.  She said that the pain had slowly worsened over time.  She was getting numbness and

tingling in her foot. She had heavy use of her cane in the past year. Her leg gave out and she fell at times. Dr. Fortin reviewed a prior EMG study and MRI. The EMG showed left L5 radiculopathy, and the MRI showed mild spinal stenosis at L4-5. R. 606. On examination, Koonce had normal muscle tone and bulk; 5/5 strength in all four extremities without pathological reflexes; absent biceps, triceps, brachiaroadialis and patellar reflexes; intact sensation to pin touch; intact toe, heel gait; and normal neurological examination. Dr. Fortin prescribed a lumbar epidural steroid injection and another EMG study. R. 609.

On January 27, 2015, Dr. Fortin gave Koonce a lumbar epidural steroid injection. R. 573-74.

On January 30, 2015, Koonce saw Physician's Assistant Venvertloh for left knee pain. R. 603-05. Koonce reported that she was doing well after a course of Hyalgan injections completed in October 2014. She reported that she started having pain after her consultative examination. She said she felt something pop while the doctor manipulated her knee during the examination. She said she had intermittent popping and catching. She denied any numbness and tingling down her leg. She also denied that her leg was giving way. R. 604. On examination, sensation was intact, no drop foot noted, tender to palpation, normal range of motion,

stress test was stable, and hip range of motion was normal without pain. Venvertloh gave Koonce a steroid injection in her knee.  R. 604-05.

On February 18, 2015, Dr. Fortin performed an EMG/nerve conduction study of Koonce.  Dr. Fortin said that the study was unremarkable with no evidence of any lumbar radiculopathy, lumbosacral plexopathy or polyneuropathy.  R. 602.  Dr. Fortin commented that her symptoms were suspicious for lumbar facet syndrome.  R. 602.

On February 24, 2015, Dr. Fortin performed a facet block at L4-5 and L5-S1.  R. 571-72.

On March 6, 2015, Koonce saw Physician's Assistant Venvertloh for left knee pain.  R. 599-601.  Koonce reported that an injection in her knee that she received in January 2015 did not provide any relief.   She reported that a course of Hyalgan injections and physical therapy did not provide any relief.  She denied any numbness or tingling down her leg.  Venvertloh stated that an MRI showed no meniscal tearing or ligament tears in her knee.  R. 600.  An x-ray of her both of her knees showed mild osteoarthritis and no acute abnormalities.  R. 658-59. On examination, her knee was not inflamed and was mildly tender on palpation.  Range of motion was normal and did not produce pain.  Sensation was intact.  Stress test was stable, and no foot drop was present.  Venvertloh assessed knee pain. R. 600.

Venvertloh prescribed a knee brace.  Venvertloh recommended a follow up with Dr. Hillard-Sembell to discuss treatment options.  R. 601.

On April 15, 2015, Koonce saw Nurse Practitioner Kristina Rexroad, N.D. for an office visit in the offices of endocrinologist Dr. Kevin Hazard, M.D.  Koonce saw Nurse Practitioner Rexroad for a consultation on her uncontrolled diabetes type 2.  Koonce reported that she had peripheral neuropathy.  On examination, Koonce had diminished sensation in her feet with monofilament and vibratory testing.  R. 668-72.

On April 21, 2015, Koonce saw orthopedic surgeon Dr. Hillard-Sembell for a recheck of her left knee pain.  R. 674-75.  Koonce reported walking a lot in the prior few days.  She reported that her pain was 9/10.  R. 674.  Dr. Hillard-Sembell stated that Koonce completed  a course of three visco supplementation injections.  Koonce said the injections did not work.  She reported pain with stairs.  On examination, Koonce was obese with an antalgic gait.  She had crepitus and pain with palpation of the left knee.  Her strength was intact and she had poorly developed quad musculature with hip weakness.  Dr. Hillard-Sembell assessed osteoarthritis with knee pain.  Dr. Hillard-Sembell told her she was not a candidate for surgery because of her age and weight.  Dr. Hillard-Sembell recommended physical therapy and corticosteroid injections when necessary.  Dr. Hillard-

Sembell stated she needed formal guidance from Dr. Prabhu for weight loss and possibly a dietitian or bariatric program.  R. 675.

On May 14, 2015, state agency psychologist Dr. Lionel Hudspeth, Psy.D., prepared a Psychiatric Review Technic and Mental Residual Functional Capacity Assessment.  Dr. Hudspeth arrived at the same opinions Dr. Havens did in October 2014.  R. 207-09, 212-14.

On May 15, 2015, state agency physician Dr. Reynaldo Gotanco, M.D., prepared a Physical Residual Functional Capacity Assessment.  R. 210-12.  Dr. Gotanco opined that Koonce could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; frequently stoop, crouch, and crawl; never climb ladders, ropes, or scaffolds; and she should avoid concentrated exposure to hazards such as machinery or heights.  R. 210-11.

On December 12, 2015, Koonce saw Dr. Prabhu for a check-up.  Koonce reported problems sleepwalking.  She said, however, she was sleeping better at night.  She denied taking day-time naps.  On examination, she had normal motor strength, gait, and stance.  Dr. Prabhu adjusted her medications and discussed insomnia management. R. 705-06.

On January 16, 2016, Koonce saw Dr. Prabhu for a check-up. Koonce reported that her grandmother died shortly after Christmas. She experienced some depression and weight gain. On examination, Koonce had normal motor strength, gait, and stance. Dr. Prabhu adjusted her insulin and reviewed insomnia management. R. 703.

On February 19, 2016, Koonce saw Dr. Prabhu. Koonce complained of feeling tired and exhausted. She said she slept through the night "with consolidated sleep." She denied taking naps during the day. She said, though, that she started to work on her diet. She had improvement in her energy level. R. 697. On examination, Koonce had no swelling in her feet and ankles. Her pulses and sensations were preserved in both feet, but she had some symptoms of numbness and tingling with neuropathy. Koonce's musculoskeletal examination was normal with no swelling; her motor strength was normal, and her gait and stance were normal. R. 698-99. Dr. Prabhu adjusted her medications and discussed behavioral and dietary changes to address her diabetes and weight loss. R. 700.

On March 21, 2016, Koonce saw Dr. Prabhu for a follow up on her diabetes. She was not following instructions of behavioral changes to reduce her blood sugar. On examination, Koonce had normal motor strength, gait, and stance. R. 695. Dr. Prabhu recommended diet,

exercise, and hydration to lower blood sugar.  Dr. Prabhu also recommended seeing a counselor.  R. 696.

On April 1, 2016, Koonce had an MRI of her lumbar spine.  The MRI showed mild degenerative disc disease and facet arthropathy, worst at L4-05, not significantly changed from the MRI in 2014.  R. 741.

On April 12, 2016, Dr. Fortin gave Koonce a lumbar epidural steroid injection.  R. 802-04.

On June 30, 2016, Koonce went to Taylorville Memorial with complaints of back pain.  She saw Dr. David Harvey, M.D.  She said the pain was moderate and radiated into her left thigh.  She said it started two days earlier.  She said she had no sensory loss or motor loss.  On examination, Koonce had moderate tenderness in her upper and mid lumbar region.  She had painless range of motion.  Dr. Harvey found no muscle spasm or limitation of range of motion.  Koonce's upper extremities had normal range of motion and no tenderness.  R. 801.  Dr. Harvey assessed a muscle strain of the lower back.  He prescribed pain medication and recommended follow up in three days with Koonce's primary care physician.  R. 802.

On July 25, 2016, Koonce saw Nurse Practitioner Brummet for a follow up of an emergency room visit.  Koonce reported pain in her left arm

that went into her chest and neck. Brummet said that she sent Koonce to the emergency room. All of the emergency room tests came back negative. On examination, Koonce could not raise her left arm more than 30 degrees before the movement caused pain. She was tender to palpation of her shoulder and into her chest. Brummet ordered x-rays of Koonce's left shoulder. R. 689-700. The x-ray showed a normal left shoulder. R. 771.

On August 21, 2016, Koonce went to Taylorville Memorial complaining of moderate left shoulder pain. Koonce saw Nurse Practitioner Susan Willer, N.P. Koonce said she had been unable to sleep for two nights because of the pain. On examination, Koonce had moderate tenderness in her left shoulder. Her left shoulder range of motion was limited due to pain. Koonce was able to perform all ranges of motion except raising her arm above her head due to the pain. Koonce's sensation was intact. Willer prescribed Toradol tablets for pain. She instructed Koonce to follow up with Dr. Prabhu. R. 796-97.

On September 16, 2016, Koonce had an MRI of her left shoulder. The MRI showed a prominent labral cyst creating a risk of impingement. The cyst implied a labral tear but no tear could be seen. R. 794.

On October 19, 2016, Koonce saw Dr. Fortin. For a follow up. Koonce reported that medical cannabis use reduced her limb pain but did not affect her headaches. Dr. Fortin said Koonce was using a left knee brace and a cane. R. 1064. On examination, Koonce's strength was 5/5 throughout. Dr. Fortin assessed that Koonce's fibromyalgia improved with cannabis and her migraines improved with medication. He told her to continue her current regimen. R. 1065-66.

On November 10, 2016, Dr. Fortin completed a Physical Residual Functional Capacity Questionnaire. R. 1053-56. Dr. Fortin opined that Koonce could tolerate working at a low stress job. He said she could walk two blocks without pain. He opined that she could sit or stand for one hour straight, could sit for a total of six hours in an eight-hour workday, and could stand for a total of two hours in an eight-hour workday. He opined that Koonce would need to stand every hour and walk for 10 minutes before sitting again. R. 1054. Dr. Fortin opined that Koonce could occasionally lift 20 pounds and frequently lift 10 pounds. R. 1055. He opined that Koonce could never crouch, squat, or climb ladders; and could rarely twist, stoop, or climb stairs. He opined that she had no limitations on her ability to use her hands for fine and gross motor skills. He said that she was limited to reaching with both arms to 50% of the time in an eight-hour

workday.  Last, Dr. Fortin opined that Koonce had good days and bad days and would be absent from work more than four days a month.  R. 1055-56.

THE EVIDENTIARY HEARING

On November 8, 2016,  the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 39-82.  Koonce appeared with her attorney.  Vocational expert James Lanier also appeared.  R. 41.  The ALJ gave Koonce 14 days after the hearing to file additional evidence.  R. 42. During this 14-day period, Koonce filed Dr. Fortin's November 10, 2016, Physical Residual Functional Capacity Questionnaire.

Koonce testified at the Evidentiary Hearing.  Koonce was 43 at the time of the hearing.  She weighed 220 pounds.  She was right-handed and lived with her husband in a house.  No one else lived in the house.  R. 44. Koonce testified she was on the County Board.  She was paid $75 a month to attend monthly meetings.  She had a 10th grade education.  Koonce did not drive.  She was in special education classes throughout her education, including in high school.  Koonce testified that she had dyslexia.  She had not worked since January 18, 2013, except for her duties on the County Board.  R. 45-46.

Koonce testified that she could not work because she could not stand without her cane and she could not sit for very long.  She said her

medication sometimes helped and sometimes did not.  R. 48-49.  Her knee and back pain were constant.  Her knees hurt worse than her back.  The right knee hurt worse than the left.  She had injections in both her knees and her back.  The first ones helped a little, but it was temporary.  R. 52-53. She testified that she had physical therapy, but her therapist told her not to come to the last session because the therapy was not helping.  She said that she used a cane and a knee brace.  She testified that both were prescribed.  She thought the cane was prescribed by Dr. Prabhu. R. 50.  She said heat sometimes helped with the pain.  R. 54.

Koonce said her legs became stiff while she slept overnight.  She had to sit on the side of the bed for 10 minutes before standing up. She said that her legs took an hour thereafter to feel back to normal.  Her feet were always swollen.  R. 69-70.  Koonce said that she had tingling in her legs all the time, and numbness in her back most of the time.  R. 71.  The tingling on her right leg went from her knee down to her foot.  Koonce said, "The left [leg] is like all in one, pain, tingling, numbness."  R. 72.

Koonce testified that moving made her pain worse.  She said nothing made the pain better.  Her best position was "slouched over sitting."  R. 53. She indicated she could sit for an hour.  She said she would have to "walk it out" before she could sit down again.  She could possibly walk half a

block.  She had pain lifting a gallon of milk with her left arm.  Her shoulder and elbow were weak.  R. 55.  She held her cane in her right hand.  R. 56. She said she could not lift her left arm above her shoulder without it hurting. She dropped items such a pitcher of tea.  R. 67.  Physical therapy made her arm worse.  R. 69.

Koonce said that she could sweep only one room before her back would start to hurt.  She could wash "a little bit of dishes" and then her back would hurt, so she would lean on the sink.  R. 56.  She could not do laundry or run a vacuum.  She tried planting in the garden.  She also picked vegetables from the garden with her granddaughter.  She did not do other gardening or yard work.  R. 57.  Koonce did grocery shopping with her husband.  She leaned on the cart while they were in the grocery store.  R. 58.

Koonce indicated she had trouble taking care of her hair and getting dressed by herself.  Her problems with her left arm limited her ability to do these things and her husband helped her with these tasks.  R. 60-61.

Koonce said that she used the cane to keep steady when walking. She also needed the cane to stand for any length of time.  She said:

> My left hip is growing in sideways and my right knee is growing
> in sideways, so I'm off balance, but the left knee does give out
> and it comes without, you know, without warning. I can just be

standing there. I mean, I fell down my house -- my stairs at my house, I fell down my daughter 's stairs at her house.

R. 68.

Koonce said that her grandchildren visited her at her home. She said the grandchildren stayed if her husband was home. They did not stay with her alone. R. 57-58. She visited her mother. Her mother lived 20 to 25 minutes away. Her husband drove her there. R. 58. Koonce said that she watched television and moved around to try to get comfortable. She did not use a computer. R. 59.

She did not go out in public often because she was embarrassed about using a cane. R. 61. She also became anxious in large groups. She said that she had anxiety attacks when she worked at the Subway restaurant. She said that she had anxiety attacks twice a month. R. 62.

Koonce had migraine headaches once a week. She then said that her migraine headaches usually lasted an hour and that her prescribed medication worked "pretty good." Once a month, the medication did not work. She said that in that case she usually had to go to the emergency room for a Toradol injection. She last got a Toradol injection a year before the hearing. R. 72.

Koonce said that she also had diarrhea three times a week.  She said

that when she had diarrhea, she usually made about 10 trips to the

bathroom.   R. 73.

Vocational expert Lanier then testified.  The ALJ asked Lanier the

following question:

> I would like you to consider a hypothetical claimant of the
> same age, education, and having the same past work as this
> claimant limited to a  range of light work with no climbing
> ladders, ropes, or scaffolds; occasional ramps and stairs;
> occasional stooping; avoid concentrated exposure to hazards.
> Limited to simple routine repetitive tasks of unskilled
> work; occasional interaction with coworkers and supervisors; no
> interaction with the public; occasional overhead reaching
> bilaterally; no concentrated exposure to fumes, odors, dust,
> gases, poor ventilation, or temperature extremes; no
> concentrated exposure to loud factory level noise or bright
> focused lighting such as a spotlight.
> Based on this residual functional capacity, could she
> perform her past work as a cashier, assistant manager, or
> sandwich maker?

R. 76-77.  Lanier opined that the person could not do Koonce's prior work.

R. 77.  Lanier opined that the person with Koonce's RFC could perform the

jobs of router, with 3,415 such jobs in Illinois and 74,463 in the nation; mail

sorter, with 1,200 such jobs in Illinois and 32,000 in the nation; routing

clerk, with 1,700 such jobs in Illinois and 112,000 in the nation; addresser,

with 500 such jobs in Illinois and 18,829 in the nation; surveillance system

monitor, with 1,604 such jobs in Illinois and 55,747 in the nation; and

document preparer, with 3,248 such jobs in Illinois and 66,430 in the nation. Lanier opined that all of these jobs would have a sit/stand option; the person could change position between sitting and standing while working. R. 77-78.

Lanier opined that the person could be off-task 5 to 10 percent of the workday and could miss one and one-half days of work a month. Lanier opined that the person could perform the representative jobs identified if she was limited to occasional reaching with her non-dominant left arm. Lanier opined that even if the person could not use her left arm at all, the person could perform the addresser job. Lanier could not say whether the person could work if she was limited to lifting five pounds. R. 80.

Koonce's attorney asked the following question about use of a cane and received the following answer:

> Q   Okay. Would the claimant's -- or the hypothetical individual' s need to use a cane when standing or walking, which would mean that I think she's - - if the person used it in their dominant hand, so they couldn't use their dominant hand for anything while walking or standing, how would that affect the ability to do those jobs?

> A   Well, the thing of is it's going to be difficult answering that question because I do not know how much of walking these jobs are going to entail. They may not entail very much.

R. 80-81.  The hearing ended.

<u>THE DECISION OF THE ALJ</u>

The ALJ issued her decision on February 9, 2017. R. 16-33. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing). 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC). 20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f). If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Koonce met her burden at Steps 1 and 2. Koonce had not engaged in substantial gainful activity since January 18, 2013.  The $75 per month as a member of the County Board was not substantial gainful activity.  Koonce also suffered from the severe impairments of obesity, diabetes, degenerative disc disease, degenerative joint disease, sleep apnea, migraine headaches, fibromyalgia, depression, bipolar disorder, and anxiety disorder.  R. 18.   At Step 3, the ALJ found that Koonce's impairments or combination of impairments did not meet or equal any Listing.  R. 19-23.

At Step 4, the ALJ found that Koonce had the following RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to

perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she cannot climb ladders, ropes, or scaffolds; she can occasionally climb ramps and stairs; she must avoid concentrated exposure to hazards. She is limited to simple, routine, repetitive tasks of unskilled work. She is limited to occasional interaction with coworkers and supervisors, and no interaction with the public. She is limited to occasional overhead reaching with the left arm. She can have no concentrated exposure to fumes, odors, dust, gases, poor ventilation, or temperature extremes. She cannot have concentrated exposure to loud factory level noise or bright focused lighting such as a spotlight.

R. 23. The ALJ relied on the repeated findings in medical examinations of normal strength, gait, stance, and range of motion. The ALJ relied on the September 2016 MRI of her shoulder and the August 21, 2016 emergency room visit in which she had full range of motion with her arms except for reaching overhead to limit her ability to reach overhead with her left arm. She relied on the x-rays and MRIs of her back that showed mild degenerative changes. She relied on the August 2014 X-ray and MRI of her knee that showed only a small joint effusion but no tears or other problems with her knee. She also relied on the February 2015 EMG/nerve conduction study that showed no evidence of radiculopathy, plexopathy, or neuropathy. She additionally relied on Dr. Fortin's opinion of Koonce's lifting and standing limitations but gave little weight to the rest of his opinions because they were not supported by the record or were inconsistent with other evidence in the record. The ALJ gave limited weight

to the state agency physician opinions because they did not consider the evidence of her condition after the dates of the opinions. The ALJ specifically said that finding of an ability to perform light work was not appropriate given Koonce's problems with her shoulder. The ALJ found that a limited range of sedentary work was appropriate. R. 23-31.

The ALJ found that Koonce's statements about the degree of functional limitations caused by her symptoms were not consistent with the other evidence in the record and so were not given weight to the extent her statements were not consistent with the other evidence. The ALJ explained that her statements were inconsistent with the numerous findings of normal strength, normal gait, normal stance, normal grip, and full range of motion in all her joints. The ALJ indicated that she had crepitus in her left knee, but the limitation to sedentary work addressed that concern. R. 24, 28.

The ALJ found that Koonce did not need a cane to ambulate. The ALJ found that a need for a cane was inconsistent with the fact that she rarely used a cane when she went to see her medical providers, numerous examinations showed full strength in her lower extremities, the EMG testing was normal, and she had no muscle atrophy. The ALJ found that her prescription for a cane "appear[ed] to be result of sympathetic medical

sources acceding to her request." The ALJ noted that she reported falls, but did not receive any treatment for falls, and she had full range of motion in her legs, normal strength in her legs, and only mild degenerative changes in her back. The ALJ finally relied on the fact that Dr. Fortin opined in his November 10, 2016, opinions that she did not need a cane to ambulate. R. 28-29; see R. 1055 (Dr. Fortin's opinion that Koonce did not need a cane to ambulate).

Based on the RFC, the ALJ determined at Step 4 that Koonce could not perform her prior work. R. 31. At Step 5, the ALJ found that Koonce could perform a significant number of jobs in the national economy. The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of vocational expert Lanier that a person with Koonce's RFC could perform the jobs of addresser, surveillance systems monitor, and document preparation worker. The ALJ relied on Lanier's opinions that even if the person could not reach overhead at all she could still perform these jobs, but also noted that the evidence did not support that level of limitation on the use of Koonce's left arm. The ALJ concluded that Koonce was not disabled. R. 32.

Koonce appealed the ALJ's decision. On March 2, 2018, the Appeals Council denied her request for review. The decision of the ALJ then

became the final decision of the Defendant Commissioner. R. 1. Koonce then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record. See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms). The ALJ must articulate at least minimally her analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical

bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

Substantial evidence supported the ALJ's decision. The numerous examinations that found normal strength, range of motion, gait, and stance supported the RFC. The imaging and EMG/nerve conduction studies that had either normal findings or mild impairments supported the finding. The decision was supported by the opinions of Drs. Havens, Arjmand, Hudspeth, and Gotanco supported the RFC finding, and Dr. Fortin's lifting and sitting restriction opinions supported the RFC finding. The August 21, 2016 emergency room examination supported the finding that Koonce was only limited in reaching overhead with her left arm.

Koonce argues that the ALJ improperly concluded the Plaintiff did not require a cane. The Seventh Circuit has held that an ALJ's failure to address a claimant's need for a cane may require a remand. Thomas v. Colvin, 534 Fed.Appx. 546 (7th Cir., 2013). However, in Thomas, the Court noted that the ALJ ignored virtually all the evidence in the record demonstrating the need for a cane. The ALJ made a "lone" mention of a cane in reference to a doctor's note that the claimant "ambulates with a cane for support and confidence". Additionally, in Thomas the vocational expert testified that Thomas could not perform any light work jobs as she

needed to be using a cane. The factors which necessitated a remand in Thomas do not exist in this case. The ALJ cited substantial evidence to support her finding that the Plaintiff's allegation of the need to use a cane was not consistent with the medical records. The ALJ noted that the Plaintiff rarely had any type of assistive device with her when she sought medical treatment and that her muscle strength in the lower extremities was 5/5. The ALJ noted that Plaintiff obtained a cane after alleged falls even though no treatment for a fall was mentioned in her medical reports and the reports showed full range of motion in her extremities, normal strength of extremities, and mild degenerative changes. Additionally, the ALJ noted that the Plaintiff's doctor had specifically noted that she did not need a cane to walk. R. 28-29. Unlike the facts in Thomas, the record in this case contained no vocational expert's opinion that the sedentary work recommended by the ALJ could not be performed by the Plaintiff if she needed to use a cane. The ALJ's finding that the Plaintiff did not require the use of a cane is supported by substantial evidence. The Court declines the Plaintiff's invitation to re-weigh the evidence as the Court may not substitute its judgment for that of the ALJ or re-weigh the evidence in this proceeding. See Jens, 347 F.3d at 212; Delgado, 752 F.2d at 82.

The fact that Koonce often walked without a cane and Dr. Fortin's opinion that she did not need a cane to walk supported the RFC finding. The lack of consistency between Koonce's statements and the findings discussed above supported the decision not to give weight to her statements.

The RFC finding and the opinions of vocational expert Lanier supported the ALJ's determination at Step 5 that Koonce could perform a significant number of jobs in the national economy. Substantial evidence supported the decision.

Koonce argues that the ALJ erred in failing to consider Dr. Fortin's opinions properly. Koonce argues that the ALJ erred by failing to give any weight to Dr. Fortin's opinions that she could rarely or never perform postural maneuvers such as kneeling, crouching, and crawling; she needed a sit/stand option; that she would miss four days of work a month; and that she was limited to reaching bilaterally 50 percent of the time at work. The Court disagrees. The ALJ must give the opinions of a treating physician controlling weight if the opinions are supported by objective evidence and are not inconsistent with other evidence in the record. 20 C.F.R. §

404.1527(d)(2); <u>Bauer v. Astrue</u>, 532 F.3d 606, 608 (7th Cir. 2008).[4]  The ALJ found that these opinions either were not supported by objective medical evidence or were inconsistent with other evidence in the record. The ALJ cited many examinations that found normal strength, range of motion, gait, and stance; and the imaging and EMG/nerve conduction studies that had either normal findings or mild impairments.  This evidence supported the opinions of Drs. Arjmand and Gotanco that Koonce was not so severely limited in her ability to make postural maneuvers or that she could sit for six hours in an eight-hour workday.

The ALJ said that the finding that she would miss four days a month at work was not supported by the record.  The Court agrees that the objective evidence did not support this finding.  There were many subjective reports by Koonce about her headaches or her other conditions, but the ALJ could reasonably conclude that the objective evidence did not indicate that she would miss four days a month.  Dr. Fortin's opinion, therefore, was not entitled to controlling weight.

---

[4] The Commissioner amended the regulations regarding the interpretations of medical evidence.  The amendments apply prospectively to claims filed on or after the amendment's effective date of March 27, 2017. <u>Revisions to Rule Regarding the Evaluation of Medical Evidence</u>, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017).  As such, the amendments do not apply here.

Substantial evidence also supported the conclusion that she was not limited to reaching bilaterally to only 50 percent of the time. The ALJ correctly noted that no evidence supported any limitations in Koonce's use of her dominant right arm. The August 21, 2016 emergency room examination showed that she could reach in every direction without pain except for reaching overhead. This evidence provided substantial support for the ALJ's decision to reject this opinion of Dr. Fortin. Koonce also argues that the ALJ failed to address all of Dr. Fortin's opinions. The Court finds that the ALJ adequately addressed the material substance of Dr. Fortin's opinions. The Court finds no error in not dissecting each sentence in the four-page questionnaire that Dr. Fortin completed. See Shideler v. Astrue, 688 F.3d 306, 310 (7th Cir. 2012) (An ALJ "need not provide a complete written evaluation of every piece of testimony and evidence." (quoting Schmidt v. Barnhart, 395 F.3d 737, 744 (7th Cir. 2005)).

Koonce argues that the ALJ erred in giving any weight to the opinions of Drs. Arjmand, Havens, Gotanco, and Hudspeth because they did not review a complete record and were inconsistent with the ALJ's RFC determination. The Court disagrees. The ALJ recognized the fact that these doctors and psychologists reviewed only the record up to the dates of

their opinions and adjusted the weight given to them accordingly. The Court sees no error.

Koonce argues that the ALJ erred because each aspect of the RFC is not reflected by a specific opinion from an appropriate medical or psychological professional. The Court again disagrees. The ALJ is the finder of fact. See 20 C.F.R. §§ 404.1546(c), 404.1527(e) (Commissioner determined ultimate issue of disability, and ALJ is responsible to assess RFC). As such, the ALJ must consider all the evidence in formulating the RFC, not just opinion evidence. Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007). The ALJ is also authorized to resolve conflicts between conflicting opinions and other evidence. Diaz v. Chater, 55 F.3d 300, n.2 (7th Cir. 1995). In this case, the ALJ reasonably looked at all the evidence and concluded that Koonce's RFC was more limited than found by Drs. Arjmand and Gotanco, but less limited than found by Dr. Fortin. The ALJ adequately explained the reasons for the conclusions. The ALJ did not "play doctor". There was no error.

Koonce argues that the ALJ failed to support the RFC finding. The Court explained above the substantial evidence that supported the RFC finding. Koonce's argument to the contrary is not persuasive.

Koonce argues that the ALJ erred in making her credibility finding. The ALJ did not make a credibility finding. The Commission has instructed ALJs not to make credibility findings. SSR 16-3p, 2016 WL 1119029, at *1 (2016); see Mendenhall v. Colvin, 2016 WL 4250214 (C.D. Ill. August 10, 2016) (SSR 16-3p applies retroactively to claims pending at the time of its effective date). Rather, the ALJ determined the weight to be given to Koonce's statements in light of all the other evidence in the record. As explained above, substantial evidence in the record supported the ALJ's conclusion. Koonce cites to other evidence in the record that she claims did not support the decision. The Court, however, does not reweigh the evidence. See Jens, 347 F.3d at 212; Delgado, 782 F.2d at 82. The ALJ must explain the basis for her decision in light of all the material evidence, and the Court must affirm if the ALJ adequately explained the basis for the decision and substantial evidence supports the decision. Here, the ALJ carefully discussed all the material evidence including medical evidence cited by Koonce. See R. 19-30. The ALJ explained the reasons she concluded that the evidence as a whole supported her findings. See R. 24, 28-31. As the Court has explained, substantial evidence supported the ALJ's conclusions. The Court will not reweigh the evidence. There was no error.

THEREFORE, IT IS ORDERED that the Defendant Commissioner Motion for Summary Affirmance (d/e 24) is ALLOWED, the Plaintiff Penny Koonce's Motion for Summary Reversal (d/e 19) is DENIED, and the decision of the Defendant Commissioner is AFFIRMED.  All pending motions are denied as moot.  THIS CASE IS CLOSED.

ENTER:   November 21, 2019

_____s/ *Tom Schanzle-Haskins*_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE